United States against Mr. Benn and others. Ms. Barrett? Do you represent Mr. Benn? I represent Mr. Benn, yes, Your Honor. And I'm going to run through this pretty quickly, but, you know, you're welcome to stop at any minute if you want to. The crux of what I wanted to talk about is the sufficiency issue, sufficiency of the evidence to convict. We're not talking about credibility. That was a jury question. We understand the jury found the witnesses credible. However, our position is that the evidence should not have been given to the jury because it was unreliable in the sense that it was not given a proper foundation, not backed up by some kind of standard of review that the court could make a decision that it was reliable evidence. You're talking about the cooperating? The cooperating witnesses is what I'm going to talk about. Witnesses or immunized witnesses? Yes, sir. That they weren't reliable? Yes, sir. But isn't their evidence enough if it's believable? No, sir. They have to be corroborated. I think there's a... Is that what the instruction was? That's part of it, although there are a couple of cases only. There's no case directly on point regarding how you qualify or assess the reliability of informant's testimony. The cases that I have found deal mainly with detainees and prisoner rights, primarily coming out of the Guantanamo Bay cases. Those cases do say that an informant's testimony against another detainee is not sufficient. Clearly saying not sufficient to be held reliable for detaining another person. In my opinion, that means that we should have a higher standard. Is that military law? Yes, sir. That's military law? Yes, sir. That's not law enforcement? I know, but I think that you can make some analogy there between those cases. What I'm looking for in cases and what I'm looking for in the court is some kind of standard whereby you and the trial court know how to assess the reliability of the informant's testimony before it's offered. I thought the standard was the jury has to... Everybody has to view testimony of an informant or a cooperating witness with caution and weigh it with great care and all that. But if the jury determined it's credible... However, the issue that we have with that is that that is too broad, not a specific enough standard, that there are some points that have been brought up in various cases not put together in one case that we would like to see the court address in terms of giving some kind of direction from here forward. And what kind of direction are you seeking? I'm seeking an opinion that lays out a standard for assessing... What standard? Okay, the standards, the points that we would like to see are that informant's testimony has, first of all, got to be corroborated by other reliable testimony. So it's kind of, you know, it's hard to... You're jumping from this isn't reliable, but is this reliable to make that reliable? What if you have two informants? Does that do it? The second informant corroborates the first one. It could be. Quantity doesn't make up for quality, though. So, you know, what we'd like to see is a standard laid out that says you've got to have cooperation from other testimony or evidence, not necessarily informant testimony, but other evidence. You've got to have a specificity in the testimony that comes from the informants, and that was a problem in this case that they gave different statements. Well, it sounds like you're arguing an instructional issue rather than simply a sufficiency of evidence, that you're disappointed that Judge Schroeder didn't instruct... Well, it all adds up, and you've got to look at the totality of the evidence to determine whether or not it was sufficient, and one of my other panel attorneys is going to talk about sufficiency in a little more detail, but we had to split this up into quite narrow little topics for a little bit of time. But you're bringing it up here in the context of sufficiency. That's exactly right. But I say it sounds to me like you're really arguing about an instruction that you think should have been instructed differently, that the jury should be given a more favorable standard to your client. Well, it could be handled that way, although what we really wanted was for the testimony to be excluded because we don't feel like... To be excluded, you thought the... Because it wasn't reliable. The informant's testimony should have been excluded. Exactly. Along with the expert testimony, too. Then it's an admissibility question. Then you're raising an admissibility question rather than a sufficiency question. No, we're talking strictly about sufficiency. Strictly about sufficiency. And if I could just run quickly through the points on the standard that we'd like to see is that there have been a couple of cases that talk about informant's testimony and suggest that the government should have some way of showing that that informant has a proven track record, that they have been used before as an informant, that they have told the same story, the same time, the same way, over and over again, that their testimony can be relied upon as being truthful and honest. That wasn't done in this case. The absence of any other undermining testimony is another point that could be raised as far as setting a standard for assessing reliability. But you don't raise the jinx issue, do you? Excuse me? You don't raise the jinx issue here. You said it wasn't reliable. Prior testimony, you said to make sure it was consistent. There's no jinx issue here. You're not raising the jinx issue in terms of they said something totally different and therefore the government should have been on notice to tell you that you're just assuming. Well, in this particular case, the statements that some of the informants, and I just don't have time to get into detail in the record of which ones and what they said exactly, but the statements that they made to the investigators were not exactly the same, and they actually admitted that on the stand when they gave testimony in court, that they may have misspoken or they'd forgotten something, it wasn't quite this, it wasn't quite that. And you used that artfully in cross-examination, didn't you? That was used artfully in cross-examination to put a chink in their armor, correct? Yes. I need to say my client has requested, and I want to throw this in here at some point because he's waiting to hear this come out in their transcript, that he also feels like his case should have been severed from the other defendants because they're making contrary arguments to his. He thinks that the Alleyn case applies to him in terms of the drug quantity determination. The jury found by special verdict a drug quantity for him, and then the judge found, as a sentencing enhancement factor, a higher drug quantity. He takes issue with that. I'm just throwing that out there. I don't see those issues myself, but if you do, I'd be happy to have that happen. So I just want to be sure that he knows that I did mention those. Thank you, Ms. Barrett. Certainly. Let's see. Mr. McClellan. Mr. McClellan. May it please the court, my name is Robert McClellan. I'm an attorney from Greensboro. I represent Mr. Sean Jeffries, and the issue that I would like to speak to primarily is one of the amounts of drugs and how this was allocated to particular defendants. One particular anomaly in this particular case, as the court might recall, is that there was a jury asked to look at count one, which was one dealing with cocaine-based crack, one other count that was a separate object that dealt with cocaine hydrochloride, and the jury came back with a limiting special verdict as to the cocaine hydrochloride. While the jury came back and said there was 280 grams of crack, they also came back as to cocaine hydrochloride and said that, yes, we believe there's more than 500 grams, but less than 5 kilos of cocaine hydrochloride. This is special as to my particular client. But the issues that several of the defendants have raised in this is how the judge allocated this crack. Also what they did in this case was a conversion, because the judge, as you might recall, in the sentencing, took that same amount of cocaine hydrochloride and multiplied it under a conversion in such that they ended up with, in my particular client as well as some of the others, 18 kilos of cocaine as what was the final allocation based on the issue of it being crack cocaine. The circumstances that we have here are ones that we're contending, of course, that the jury had made a decision about what was the appropriate allocation, and that was ignored by the trial court in terms of arriving at a larger amount. Also, too, as the court might recall, in this case there were some trips that were made. They were allocated to my particular client. One was a trip to Atlanta. It occurred in 2008, where a number of people went to Atlanta, and supposedly 8 kilos were returned. Well, there was also a trip to Texas, in which they took money amounts, not cocaine, and converted that into cocaine and then converted that into crack cocaine. So there's a number of bootstrapping conversions that are occurring here. We contended, and was contending at trial, that Mr. Jeffries had nothing to do with the trip to Atlanta in terms of the cocaine that was found on that particular trip. He was riding with other individuals. The jury had to agree with that because there were 8 kilos of cocaine on that particular trip, and the jury found that there was not more than 5 involved with cocaine hydrochloride. So the jury had to have agreed that that particular trip was not attributable to my particular client. That's one concern we have about the trial court. Who all was on that trip? On that trip was Mr. Ben, Mr. Jeffries. There was another couple of individuals that went that were unindicted co-conspirators, supposedly. Mr. Ben was the one who went down there for the trip. He was the one who drove, as I recall. And you might recall that somebody jumped out of the car with 8 kilos at a ransom location. When the police were chasing them, they jumped out of the car and hid it all. Went back and got it. And my client went back to a hotel room with another person. And so he was not directly involved in the cocaine itself. He was not trying to hide it. He was not a person that was directly involved in going down there for it. And the jury obviously found that because they said it was less than one. Did he do any driving? Excuse me? Did he drive? No. There's no evidence that he drove either? I believe he was just a passenger. And the only time that he had anything to do with driving was they had taken Mr. Ben down for questioning. And my client drove the other individual to a hotel room where they stayed. But doesn't the Young case in the Fourth Circuit permit the district court to find a greater drug quantity at sentencing than the jury found? Well, the Alene case has some issues with that because we're going back now to where the Supreme Court is saying that Alene said, we're going to give more credence to the jury making decisions about what should occur in this case, what thresholds are met, what are going to be elements of the case. And certainly here, the judge charged the jury and told them, here's the levels of which you should decide. You should decide what the amount should be. And the jury was given that option, and they found a lower amount. And so with that in mind, the judge saying to the jury, yes, I'm going to listen to what you have, but I'm going to tell you also that I might disregard that. And so the jury doesn't know that. They're knowing or believing they're establishing what the drug quantities would be, and that was later determined not to be of effect to the court. So we contend that the drug quantities should be looked at, certainly in terms of Alene now being a factor, the fact that the jury found that there was not more than five kilos, and yet some of these calculations directly involve more than that. Any other questions from the court? I believe my time has expired. Thank you very much, sir. Thank you, Your Honor. Mr. Fisher? May it please the court. I'm Clark Fisher of the Ashe County, North Carolina Bar hearing on behalf of Robert Poole. And what I'd like to do this morning is briefly address the sufficiency of the evidence argument, specifically as it relates to Mr. Poole. That's the only issue you raised, right? The only issue. Yes, sir. There was not enough evidence to convict him. That is absolutely correct, Your Honor. And I would certainly echo the argument made by Ms. Barrett as to the general reliability of Mr. Williams. But even accepting that Williams was not credible for the purpose of this argument, giving the government the benefit of all appropriate reasonable inferences, we contend that the evidence showed only that Poole was so far down the line in this Bundy boy drug operation that while he perhaps could properly have been convicted of substantive offenses, such as possession with intent. They found him with 14 grams one time, possession of cocaine. But he was not a member of this Bundy boy's conspirator. If you look at the evidence, most of which had nothing to do with Robert Poole in this case. But the evidence that did apply to him, you have a picture of a longtime drug addict who clearly never made a cent off of this. What he did, he was paid for in crumbs. Repeated government witnesses testified to that. And his activities were as a taster, which I guess is consistent with getting paid in crumbs to make sure that the crack wasn't there. Being a taster, you say, is so much a minor participant that he's no participant at all. In the conspiracy, yes, sir. He's not in the conspiracy. He's not a conspirator, even though he was a taster. Of course, I'm sure you were getting to this. He was more than a taster, though. He tasted it. He packed it. He distributed it. Wasn't he the one that ran with it out of the back of the van? That is correct. Was that on the trip back from Atlanta? Well, I think this one was from Gwinnett County, Georgia, if I'm remembering the facts right. There was evidence of a variety of trips to different locations in Georgia. But I think that's an interesting point. Because if you read Mr. Poole's pre-sentence report, I think it's paragraph 25, we learned some new vocabulary. Apparently, he was a moat. And a moat is somebody whose job is to take drugs in the event that the people who we contend, if you accept the government's evidence, are in fact the conspirators, take the drugs and run. So it's the moat that might get caught, not the people who are actually running the operation. So the moat, then, by that description,  and the operation. Everybody plays a role. And he sounds as though he played several roles, although he may not have been the one making all the money. Well, certainly everybody plays a role, Jim Snacker. Of course, everybody at General Motors who built one of those cars plays a role. But they are not all involved in any organizational sense. Of course, you look at the government's evidence. If making cars was illegal, they might be. Well, not yet. No, no. No, you made that analogy. That's because making cars is not illegal. But if you were on the assembly line every day welding the parts, painting them, that would be consistent with the conspiracy to manufacture automobiles, wouldn't it? Your Honor, I would contend that would be an overbroad interpretation of criminal conspiracy, looking at the facts of this case. So your position basically is the application of conspiracy law to this set of facts as to your client. Yes, sir. It just doesn't reach your client. That's what you're saying. Yes, sir. It's too far down the line. Yes, sir. Even though he may be guilty of a substantive offense, you say. Yes, sir. Absolutely. I think the government clearly proved, at least as to that 14 grams he was caught with, possession with intent. I appreciate your argument. I think you're making a good argument. But the problem is the small role that he has, albeit small and far down, albeit far down, is integral to the conspiracy. You're tasting more than the amount you're going to use to test it for the enterprise. You're running with more than you're going to use to protect the enterprise. That's the problem. It doesn't matter how far you are and down you are. If you know the enterprise and you're doing something, if he was running with just small amounts, that's OK. I'm going to take the little bit that's mine and I'm getting out of here. Or I'm going to taste what you gave me and make sure it's good and I'm gone. But you're tasting to verify the quality of the big thing for the big thing. You see what I'm saying? I don't see how you disconnect the small thing from the big thing when everything you're admitting to relates to making the big thing work. Because if you get bad drugs, they can't sell bad drugs. If you get caught with your big supply, you go to jail. That's why you run away. How do you get away from that? Your Honor, I think you have to look at the specific conspiracy the government alleged. It's the Bundy Boys conspiracy. No question about that. A historical conspiracy went on for years involving multiple drug houses in the area. And the government's evidence was that, again, if you accept that, with all due deference to co-counsel, Ben's the president. This is what Williams described. Williams was the vice president. Then you have other officers, clearly all involved in organizational activities. And then, way down here, way down here, you have somebody like our poor, pathetic drug addict, Mr. Poole, who we contend his role was qualitatively different and it wasn't even that slight connection that Preston applies. And here, unusually, we have not one, but two government witnesses, Toshi Mumford and Greer, Helen Greer, both of whom said Robert Poole was not a Bundy Boy. He was a smoker, he was a taster, but he wasn't a Bundy Boy. And on the evidence you have here, if he's not a Bundy Boy, I will contend he's not a co-conspirator. Guilty of substantive offenses? Absolutely. But the government didn't charge those. And I see I'm... Did he get the lightest sentence? He did. He got 114 months, which was substantially lower than the other defendants. He did. Your proposition that he was a minor participant... Well, I think the government concedes that he was... Well, you say he's not a participant at all. But he was such a minor participant that he wasn't even guilty of conspiracy. But he did get the lighter sentence. Yes, sir. And the jury, of course, found him, in terms of the drug quantity, substantially lower than the other people. Our position is that's a start. We ask the court to take it one step further. Oh, you all were the trial lawyers at the case? I was not, Your Honor. You were not. And unless there's any other questions, I will look forward to my remaining 60 seconds. And let me just say, anytime you want to hold court in Charleston, please put me on the list. Well, there's another Charleston in the circuit, you know. Well, I'll go anywhere. All right. Thank you. Mr. Johnson? Good morning, Your Honors. My name is Thomas H. Johnson of the Guilford County Bar at Greensboro, North Carolina. I am counsel for Mr. Kevin Haith. The court had inquired as to, Mr. Fisher, whether there was trial counsel. I was trial counsel for Mr. Kevin Haith in the course of this trial. The issue that I would bring to the court is, one, with regards to the admissibility or admission of an expert witness, Corporal Marsh, corporal with the Greensboro Police Department. He wasn't a captain. He wasn't a chief. He wasn't a major. He was a corporal. On February the 7th, Defendant Dan filed a request for discovery of the expert witnesses. There was no response. On the 16th, a notice was given of an expert witness, Corporal Marsh. And trial had already commenced by the time that notice was given. Is that correct? Yes, Judge Thacker. Trial commenced on the 13th. Jury vorti had begun. The jury had been impaneled. Witnesses had been examined, direct testimony, and cross-examined by the defense. Other witnesses? Yes, Your Honor. That discovery had been given. There was no mention of a Corporal Marsh as an expert witness in the volumes of discovery, which was hard copy and also digital. What was his expertise characterized by? Well, Your Honor, I contended that he had no expertise whatsoever. But the government contended that he was an expert in street talk or telephone talk or code for drugs or what was it? The government's contention was to put on evidence on the use of guns and furtherance of drug trafficking and distribution of crimes in their response to my motion in limine that I filed. Connection of drugs and guns. Would that be the... Well, Judge, the evidence, if you're in the trial, the evidence speaks for itself. There's a charge of benign 24C, doing it in relation to a drug trafficking offense. That is not necessarily what Corporal Marsh's testimony pertained to. What he wanted to say was that it was in protection of drugs or that they were used in violence, that violence begets violence, which kind of heightens the anxiety of the courtroom, the anxiety of the trial in and of itself, a sort of misplaced context of fear, which is a problem. You wouldn't have a problem if he got on the stand and said they were involved in drug trafficking and that normally follows that you have guns. Would that have been a problem? Well, Judge, I have to defend my client with the evidence that's presented. There was evidence, and there was evidence of drugs, there was evidence of guns. However, the trial starts on the 13th. He's not been given the discovery two months earlier, been preparing for trial. On the third day of trial, on the 16th, you're going to tell me you're going to bring in a new witness and you're going to tell me he's going to be called an expert. He's going to get that favorable rating. Didn't you ask, wasn't there a request for an expert disclosure a week before trial? That's correct, yeah. Why did they come back and ask for another go at it when there was no notice of an expert for the two-month material they got? Judge, there was no response by the government to the request for disclosure of experts that was filed on the 10th. The judge said something like this is the way they normally do it. What judge? I think, that's my recollection. The way they normally do it is this way. What we normally do is an open file. You do down there? Yes, Your Honor. The U.S. attorney gives you an open file. The U.S. attorney gives us an open file. It's either in hard copy or it's in a digital file. We have an open file here. There was nothing in the file about? Nothing in the file about Corporal Marsh Nothing in the file? About being an expert witness. Being an expert witness. Or his training. And I requested what training he had, what expertise, what scientific methods he was prepared to testify under the Daubert study. He didn't give you an expert report. No expert report. He never did get a report. He didn't have a report. Right, he didn't make a report. He didn't make a report. But the timing. Surprise, surprise, surprise. But that issue is something we review for abuse of discretion, right? Well, it's an abuse of discretion, Judge. We have to review it. We have to give the judge some leeway. You've got to give the judge some leeway. I'm more concerned with what the expertise is. I mean, guns and drugs. It sounds more like common sense, doesn't it? What had he been trained for? Was he trained to testify as an expert? No. Was he trained to testify in the course of guns and drugs? It has to be in this field or whatever it was. Well, this field is the law enforcement for the city of Greensboro. Was he in uniform? I don't recall him being in uniform. He was in a jacket top. When you filed your response to the motion, when they filed the response to your motion, what was it the government said this expert was going to opine on? The government's purpose was to put on evidence on the use of guns and furtherance of drug trafficking and distribution crimes in their response to my motion to eliminate, Judge. In a nutshell, that's to take the line from their response. We contend that you have prepared and joined for trial that the lines are set. The evidence is what the evidence is. It's a very surprising ambush to be in trial three days and find that you're going to get an expert and not have an opportunity. We're already in trial. We cannot get our own expert. That is one way to try to deal with some experts is that you get your own. We're in trial. I'm in trial with Mr. Hay from 930 to 5. Well, sometimes we're going to 6 o'clock that day. What would you have an expert say? That guns and drugs don't go together? Well, Judge, in the typical context, I get whether it's the government's witness or in a civil case, the other precise vitae of the expert, the report, and then I check and see if there's another expert in that field that can give a report favorable to my client or my side on that particular expertise. Right. We're going to appreciate you don't have the same Rule 26 type of devices you have on the civil side. But my question, I think, would need Judge King's permission, just so I can recast this question as I understand it. What is the core of what Marsh said? The core, as the French would say, the piece de resistance, that you really wanted to have an opportunity to rebut. What did he say, the core thing that you said? If I had an expert, they may have been able to say that's not true. Tell me that. What's the core thing? Well, that's exactly right. By him being characterized as an expert, I'm not allowed to say that is not true. But what is it? What is the thing that he said, though, that's not true that you should be able to refute or keep him from saying? Both ways. Well, he's participated in the investigation. All right. If you'll allow me, please. Judge Gregg, he participated in the investigation. So he has an intimate knowledge of this case. But by characterizing him as an expert, he's now positioned in this unassailable position of giving credence to the whole investigation and all of their witnesses because he paints it over with this big, broad brush and because he's now, quote, an expert. I see. So he gillied the lily for them, basically. That's what you're saying. And we have no opportunity. It's a surprise. We have no opportunity to rebut that. It's not unusual for the government to use those types of law enforcement experts in drug cases, is it? That's not unusual. But I contend to the court that it is rare. And we contend that a bright line should be drawn here because it invites, in every conspiracy case, for them to take a corporal, not a sergeant, not a captain, not a major, but a corporal out of the police department or whatever. We're not talking about a special agent. We're not talking about a DEA agent. We're talking about a corporal from the Greensboro City Police, could be a corporal from the Charleston Police, could be a corporal from the Mount Pleasant Police, and put him into the case as an expert three days after the trial had started. And if that is the case, then why not wait until the last day of trial and present your expert? Once the trial started, the lines had been drawn, you are set. The battle has been formed. The battle is joined. Did they say they just found out about Mr. Corporal Marsh that they didn't know about him beforehand or hadn't thought of using an expert or anything like that? What was their excuse for being late? Well, Judge, I should have argued they're late, and maybe that would have kept them out. But as you can see, we went through a hearing. We said it was a surprise. We said that, and the judge says we're going to go forward. And therefore, because the judge says he's going to go forward and understand it is an abuse of discretion, I have no choice but to say, yes, the judge abused his discretion by letting Corporal Marsh testify as an expert. Not that they let him testify, but as an expert. Did you argue they didn't need an expert on the relationship between guns and drugs? Well, Judge, that was the context. My motion eliminated to identify why they needed him as an expert, but they did not redress that. Because he had no publications. He had conducted no tests as to the link between drugs and firearms. So he was just... He based it on his training and experience. Training and experience, a training that he had attended other seminars by people teaching. Now, if he had brought the people that were teaching the seminars because he had been teaching, then maybe my position would have been weakened. But if you're going to bring the student and call him the expert, what about the teacher that taught the student, that could have brought him? We're just saying we were surprised because I would have had some questions for the teacher because he'd have had some materials. He'd have had a VTAC. He'd have had publications. I could have researched those and criticized those and found some counter... Did you cross-examine Corporal Marsh? Yes, I did cross-examine him. Yes. But, again, the best... Outside of cross-examination, the best test for an expert is another expert opinion. And we were deprived of that. Did you ask for a delay to try to get another expert? Well, we had already had two continuances. I mean, a delay... We didn't have... The trial had been joined. So you didn't... We did not ask. We're three days into trial. I had... I had... And the other three lawyers had invested much time in preparation to prepare for that trial, set aside other conflicts to be at that place at that particular time to go forward. We had... There were numerous hours where we had spent in preparation together and with our clients. We were contending that that particular witness could have testified, but not as an expert. Well, he didn't... He really hadn't been much of an investigator in the context of this case. He just got up there and said what he thought about the case. My point exactly, Judge. He hadn't been that much of an investigator in this case, except that he came in as an expert and gilded the lip. Why don't you let us... Why don't you let the government make some arguments here? Let's see what they've got to say about all this. Again, I will join with my co-counsel, Mr. Fisher. Anytime you would like to invite my humble self to this fine city, I'll be happy to go or anywhere else, of course. Thank you. Thank you, Mr. Johnson. Ms. Boggs? Yes, sir. Thank you, Your Honors. May it please the Court. My name is Lisa Boggs. I'm Assistant United States Attorney in the Middle District of North Carolina. Seated with me at council table is Stephen Inman. He was my co-counsel at trial and also assisted in the preparation of brief. If Your Honors please, I would like to address the issues of Alene and Davis if the Court has questions with regard to those two cases, as well as sufficiency of the evidence and drug amounts. Mr. Inman would like to address the Court with regard to any questions the Court may have as to the leadership role of Mr. Jeffries, as well as the questions regarding the use of an expert witness. I'd like to first start, Your Honor... We've got some questions about that expert witness, I think. But you're going to talk about something else first. That was our intention, Judge. I'm certainly happy to try to answer any questions about the expert. That's how you do it, but you don't want to do it. With regard to the sufficiency, Judge, in this instance there were several co-conspirators. Now, the term informant has been used and was used in the brief. We didn't have the testimony of informants. We had a cooperating co-defendant who was subject to cross-examination as he testified in open court. And, therefore, the jury had the ability to find... So the difference between an informant and a cooperating co-defendant? Well, and this is... Often an informant in some of the case law that was cited dealt with search warrants and whether or not there could be sufficient finding of the reliability of that informant to satisfy the proof necessary to obtain a search warrant. That's not what we had here. We had a cooperating co-defendant. That person took the stand and testified for hours. You're talking about Williams. Mr. Williams. But Mr. Williams, I would note, was not our only witness. There were other cooperators. Ms. Greer, Ms. Adams, Mr. Duff, and... You all gave Williams immunity? Mr. Williams did have an immunity agreement, yes, sir. He was convicted... That all came out before the jury? Yes, sir. He was convicted of an earlier offense and then he agreed to cooperate. He was given immunity as to any other involvement he had and then he testified in discovery the immunity agreement was given out. It was subject to cross-examination. Did he get any time in prison? He did. In fact, he's still in prison, Your Honor. He was convicted for an offense that's occurring on the 10th of February of 2009 and an offense late in 2008, two searches at his home. After that time, on May 10th of 2010, he agreed to cooperate and speak with agents. Among the things he told them was he set out the story of the conspiracy. There had been numerous searches throughout the city of Greensboro of crack houses, but after Mr. Williams was arrested and talked to officers, then it all became clear as to who was working with whom and how that organization was run. At that point, he also gave information about Mr. Jeffries in a residence at 605 Watt Street. Four days later, Detective Austin and other members of the Greensboro Police Department went to conduct surveillance, and within 30 minutes, Mr. Jeffries was seen arriving at that location. Detective Austin had indicated he had seen and was familiar with 610 Watt Street. Ms. Mumford and others even mentioned that address. But Detective Austin said he had not been familiar with 605 Watt Street other than the fact it was an abandoned house. So he conducts surveillance and sees exactly what Mr. Williams said he would see Mr. Jeffries do about how he went out back, he had a key, even though it was an abandoned residence. He also, when he did go into the residence, found crack cocaine, packaging materials, and firearms, three firearms, one of which was a 10-millimeter that had Mr. Jeffries' frame ear print. Before Detective Austin ever went into that house, there had been information given from Mr. Williams that Jeffries carried a 10-millimeter silver firearm. That's what was found. There was also what's known as a street sweeper, which is a shotgun, but it has a round drum, and Mr. Williams had said it looked like a Tommy gun. That's exactly what Mr. Williams... That's exactly what officers found when they searched the residence. And for sentencing purposes, those factors are very corroborative of what Mr. Williams said. But also, once Mr. Williams gave a statement, then the officers went back and started talking to other members of the conspiracy. They talked to Helen Greer. She corroborated the 8-kilo trip to Atlanta and a prior trip to Atlanta. So there was all this corroboration of the sort that Ms. Barrett was asking for. We would contend there was corroboration, and we would also contend, as we did in our brief, if you even took Mr. Williams out, there was still testimony from other cooperatives in this conspiracy, which would support a finding of guilt as to that conspiracy. I'd like to move on, unless the court has other questions with regard to the sufficiency of the evidence of a conspiracy. I will note, with regard to Mr. Poole, the case law is clear that even if you're a minor participant, and he did receive a downward adjustment for a role, he wasn't the decision-maker, but he was, as the court said, an integral part of this conspiracy and played many roles within the conspiracy. With regard to drug amounts, Judge Schroeder used his judicial discretion in finding drug amounts. At the time of the sentencing, a lien had not yet been decided, but the court's decision in the United States versus Young had been. And this case followed Young, and we would contend Young actually is exactly what a lien asked the judge to do. The jury made findings with regard to the amount of drugs, and there were differing drugs. In fact, in Young, it was the same level that Mr. Jeffries was. The court, or the jury in Young, found he was responsible for 500 grams to 5 kilos, but the judge at that point felt he was bound by the jury determination, and this court reversed that. But the judge had made a finding, even in the initial sentencing, that had he been able to take into account other drug amounts, he would have found in excess of the 5 kilograms that the jury had limited. So we would contend Judge Schroeder followed Young. He looked at the testimony, and there were two ways to determine drug amounts. He looked both at the number of sales from crack houses based on testimony of witnesses, and he came up with a crack amount. On the flip side, he looked at the number of trips and converted the cocaine hydrochloride into crack cocaine because it was clear from the conspiracy they sold crack. They possessed the cocaine with the intent to manufacture and then distribute crack. But Mr. McClellan argued a lien, and what is your response to that? A lien clearly says that that is not taking away judicial fact-finding. The facts or the elements, and Judge Schroeder actually instructed that it was an element of the offense that they were to find the drug amount parameters. So on the jury verdict, they could find less than 28 grams, they could find 500 grams to 5 kilos, or they could find more than 5 kilos, and similarly with the crack. So the judge had the jury find those parameters, and as the Young case said, once the jury makes a finding, then it is up to the court to sentence within those parameters, but just as in Young, the court could have gone above that amount. The differences in sentencing and trial is the judge can take into account relevant conduct and other factors which a jury would not at this point be finding. We would contend if you take a lien to the ends that the defense counsel would request, the jury has to make every finding, then we're going to have juries making findings as to the number of victims in a fraud case, the amount of the fraud. What about cross-references? Yeah, you do if it takes that to get the mandatory minimum. I think your argument is that if they found enough to meet the mandatory minimum sentence. Yes, Judge Greger. We contend with regard to the mandatory minimums. They did make that finding. But if you go further, then what's our jury going to be doing? They would be able to hear evidence that at this point would not, such as a cross-reference on a felon in possession case. If someone had murdered someone, but we charged him with a felon in possession and started our case with the vehicle stop where the gun was found, well, now we're going to have to put on evidence of a murder so that the jury can find the cross-reference. And we contend that is not what Alene says, and the judicial fact-finding is still alive and well, as it should be. And Alene's made no difference. And Judge Schroeder, without benefit of Alene, actually followed Alene. With regard to the Davis case that hasn't really been raised, we would contend that it does not affect Mr. Haith's sentencing at most. It would have changed his criminal history category from a Category 6 to a Category 5. However, he was at a base-offense level of 43, and even a 43-1 was a life sentence. Three out of the four defendants before this court, based on their advisory guideline range, were facing life sentences. Judge Schroeder found facts, and Ben, for instance, ended up with a base-offense level of 48. Mr. Jeffries was, I believe, 45. But the court found that that life sentence should be saved for the worst of the worst, and he varied downward on each of their cases. And we would contend that the judge's sentencing was reasonable, there was no error in this case, and unless the court has other questions, I will defer to you. What about Van and the camps? With Van, in this instance, Mr. Haith was charged with indecent liberties, but unlike the situation with Van, he was charged solely with the A-2 upon the body of. So Van would really, since Van had indicated that was a crime of violence, we did not have those disjunctive charging. It was only charged as the A-2. What about the camps? Again, we would contend that because it was only charged in that one way, and based on the indictment, which would have been before the court, that particular issue was not raised at sentencing, so Judge Schroeder did not specifically make those findings. We raised that just to notify the court that we were aware that indecent liberties may have some issues, but in this case... But the camps was decided after the trial. Judge, I'm sorry, I don't recall the date, but I believe that was correct. It was decided last summer. But if the court has any other questions, otherwise I'll defer to Mr. Inman. Thank you. Thank you. Mr. Inman? Thank you. What is the jurist going to talk about? Your Honor, the court please. Steve Inman from the United States. In the time remaining, I'd like to address two matters. One, the district court's findings of fact with respect to the leadership role assigned to Mr. Jeffries, and also the district court's ruling whether it abused his discretion with respect to the expert testimony of Mr. Marsh. Why don't you do it in reverse order? Your Honor, with respect to Mr. Marsh, and we addressed this in our brief in pages 57 and 58, trial did begin on February 13th with Bardier. We noticed the testimony of Mr. Marsh with respect to the connections between guns and drugs and drug packaging and drug prices. The main thrust of Mr. Marsh's testimony... When did you do that? When?  And, Your Honor, Judge King had asked a question about why we did that. That was after the trial started. How long after the trial started? It was two days after the trial started. And before the trial started, counsel had made a motion for expert information. Yes, Your Honor. And we certainly provided, say, the SPI experts who testified about the drug analysis. But you didn't with regard to Mr. Marsh until after the trial had started. That's correct, Your Honor, because... And I think you were getting ready to answer the question as to why it was late. And in the Middle District of North Carolina, it typically comes in as a lay opinion of the officer. And so there was some discussion between Ms. Boggs and I about whether it even needed to be provided as an expert opinion. And so we decided to err on the side of caution and file the notice with respect to Mr. Marsh. We provided a CV for Mr. Marsh detailing his experience. Why didn't you do it before the trial started? That's the question. Because it just hadn't arisen, Your Honor, that this would be in connection, that he might be a possible expert, if you will, that it wasn't going to be just similar lay testimony that ordinarily comes in these drug analysis cases. Did you have an expert report? We did not, Your Honor. We indicated what he was going to be testifying to. What is his expertise? That's what I'd like to figure out. What, I mean, expert in what? Guns and drugs. He was talking about the connection between guns and drugs, Your Honor. And so one of... We didn't go out and pick out about anybody on the street. I can tell you that guns and drugs run together. Well, and that's what... Why do you need an expert? Well, that's certainly one way that this could be resolved, and that's the way this court resolved this in Pomeranke, which is to say that even if there was expert evidence that shouldn't have been admitted, it was harmless error, because it's sort of common sense that guns and drugs go together. But we had a burden, and this is what the court talked about in Epps and in Pomeranke, where we had a burden with respect to the 924C counts to prove that the guns that Mr. Haith possessed... But you get up there and you call him an expert, and that just puts a ribbon on it, on top of the evidence about these felons. Well, Your Honor, what this court has said with respect to law enforcement experts testifying about drug trafficking and guns is that the common juror doesn't know about the connection between guns and drugs, doesn't know about drug distribution practices. And so... And Mr. Marsh testified, Your Honor, it was on two to three pages in the record about why drug dealers might have guns. He didn't talk about these specific drug dealers, why they had guns. He didn't offer anything about their state of mind. He simply said they might have guns to protect their product, to protect their money. People in the drug business carry guns. He said that. And he talked about the types of guns. Yes, Your Honor. Went through a long list of them. Yes, Your Honor. Some of them sound terrible. Well, it certainly was relevant to those 924C counts. And with respect to the timing, again, this goes back, as Your Honor mentioned, to an abuse of discretion issue. What about the judge said that this is normally the way they do it, or something like that. I thought that was in the context of being late. Why are you normally late in giving notice? I didn't think it was in the context of being late. I thought it was in the context, again, of this is ordinarily late testimony, not what we would ordinarily provide as expert testimony. Under the rules,  for using an expert in a criminal trial? Under the rules, if the defendant requests it, we are to provide the CV and a notice of the opinions that the expert's going to provide and the basis for those opinions. You didn't do that? We did it, Your Honor. We just did it on February the 16th. You did it late. You gave him a CV and a summary of what he was going to say? We told him what he was going to say, Your Honor. Did you write it? Did you write it down and give him a, what did you call that second piece of paper? Was that the CV? A summary of what he was going to say? Any opinions? What he was going to testify about. You gave him that? Yes, Your Honor. In writing? Yes, Your Honor. I believe it's in the record. I have to look at the docket to cite it. And you gave it after the trial started? Yes, Your Honor. And Corporal Marsh didn't testify until February the 27th. And when did they request it? I'm sorry, Your Honor? When did they request it? They requested it on February the 7th, so a week before trial. Five days before trial. Yes, Your Honor. Or a week before trial. And you gave it to him after the trial started? Yes, Your Honor. And Corporal Marsh didn't testify. What was your explanation for being unable to do it before the trial started? Again, Your Honor, that it wasn't the kind of information that we typically consider an expert opinion. And so... But we want to make that an expert opinion in this case. And to make sure that we were going to have Mr. Marsh be able to testify,  And so he didn't testify until February the 27th. Error on the side of caution would mean that you'd give it to him even without a request, but you'd give it to him timely, early on. They might come in an expert and say, Mr. Corporal Marsh doesn't have the right experience. He doesn't have the expertise. Well, one thing, Your Honor, they didn't take... They didn't have an opportunity to do that. They didn't take Corporal Marsh up on voir dire and question his expertise. And they did not ask... Well, that's one way they could have done it, voir dire, but they also brought in another expert, a retired police officer, to say, I know Marsh, he doesn't have much experience in this kind of stuff. Well, Your Honor, he didn't testify. They could have challenged him. I mean, they could have... They could say, you don't need expertise in going to guns and drugs. Well, that's certainly one way they could have handled it. And when... They didn't have a chance. They were late. They had a week between the time he was noticed and when he actually testified. And what Judge Schroeder said was, this is the kind of testimony that is not unusual in these types of cases. Nobody's surprised here. There's no prejudice to these parties. They've had a chance to prepare for it. And I will tell the court, the defendants never asked for a continuance. They never asked for an opportunity to get their own expert. They never asked for a mistrial in this regard. And the reason is, Your Honor, is because it wasn't surprising. It's not unusual in these kinds of cases to have police officers testify about the connection between guns and drugs. In fact, it's so not unusual that, as I said, in the Middle District, we don't typically file the notice of expert opinion about it. We ordinarily bring it in as lay opinion testimony. And it usually comes in without objection on that respect. And so, for all those reasons, the district did not abuse its discretion with respect to Mr. Marsh, and the defendants certainly can't point to any prejudice by the admission of his testimony. And as the court pointed out, it's so common sense that if the jury were to disregard it altogether, they would be left with a common-sense decision about the connection between guns and drugs. Do you have an open-file policy? We do have an open-file policy, Your Honor. It wasn't filed here, though. Well, there was nothing in the file with respect to Corporal Marsh and this proposed expert opinion, Your Honor. He was on your list to call. He was on our list of expert... He was on our list of witnesses. Was he listed for them? He was listed, Your Honor. So they knew he was going to testify. Well, we had thought that he might also testify as a fact witness and to avoid any kind of issue... So that was disclosed. He was disclosed as a fact witness, correct? He was listed on the list of all our experts. Yes, Your Honor. We listed our fact witness and our expert witnesses. Mr. Marsh was on that list. He actually ran a canine around some money at one point in the case, and we decided not to have him testify about that fact. That's the question I have. He's an investigating officer in the case, and you're giving him something that we don't allow lay fact witnesses to do. He can have an opinion about something, something he has not seen, because he talked about cocaine production and distribution. The United States, he talked about how crack houses are operated generally, how he gets to basically say, well, they normally do this to protect themselves. Well, see, as a fact witness, he couldn't say one of these people... They did it to protect themselves. Objection sustained. He never heard them say that, but as an opinion, he could say that. Don't you think that's... It's tough enough to defend any criminal case in a federal court. The conviction rate is so high. Let alone have an expert be able to give opinions who's nothing but an investigating officer and say, oh, yeah, they always protect themselves, they always do it this way, and this is how they even think. That's more than just as you... Almost you just say nothing rather flippantly. I don't mean that to be derisive, but it is rather flippant to say, oh, we do this all the time. Well, the Middle District, your office doesn't control Jewish prudence or the law or the Constitution's protection. That's a very serious matter when you're turning somebody who's nothing but a fact witness, which you almost admit to today. I can see this would be a concession to the government when you say, oh, yeah, this person, he's late. We only did it here because we wanted to be air on the side. I don't know what you call it, side of caution is, but to me, you're conceding he's not an expert and you did this and you blessed this before the jury. Counsel said whole atmosphere. That's not just something you just whisk at, and I want to know your policy in terms of your office, U.S. Attorney's Office of the Middle District. Is this the kind of thing you think is just nothing, no big deal? Well, Your Honor, certainly every case is a big deal. Every case, certainly this drug conspiracy case was a big deal, and again, we don't ordinarily file the notices with respect to these witnesses, and so to try to follow the rules with respect to experts, we wanted to make sure that we were following them, and so we filed this notice. Now, it was late. That's not following. You miss it. It's not following the rules when you take somebody who's a fact witness and say we're going to make them an opinion. That's not following the rules. The rule is you shouldn't put anybody before to the court that's not an expert at all. You have a responsibility not to do so. Well, Your Honor, he was not a, he did not testify as a fact witness. He testified with respect to his opinions. I know that. I thought something was missing. We're ships in the night. You can't propose someone who you know is a fact witness as an expert. That's what you did. You just admitted that normally as a fact witness and we put him on as an expert. You conceded that already. Well, there are some fact witnesses who offer lay opinion testimony, and this court has said that's okay, and he may have well been somebody who could have testified as a fact witness to offer lay opinion testimony as somebody who has the experience that he does. What do other courts say about this kind of testimony, whether it's lay opinion or expertise? I mean, he's not a scientist or anything like that or an engineer or a doctor or that kind of stuff, I don't think. But you say you normally use it as a lay testimony. Well, why didn't you extend your lay opinion? Why didn't you do it this way, particularly when you were lay? Or why did you not use it at all? You had plenty of evidence anyway. I mean, the government's got a special responsibility in these kind of cases. When you've got people facing life sentences and you've got, arguably, you thought you may well have overwhelming evidence to incriminate them, and you end up with something like this in the middle of it. Well, Your Honor, I think if it had been that critical, if the defense had seen it as that critical, they would have jumped up and down and asked for more time, asked for a mistrial, asked for time to get their own expert, and they didn't do that. Blame it on the defense lawyer. There you go, that's another good tactic. Well, as Judge Schroeder said, Your Honor, no one was surprised by this kind of evidence, and they had a week to prepare between the time of notice and the time in which Mr. Marsh testified. Well, I think Mr. Johnson was at the trial, and I thought I heard him say he was surprised. Well, he didn't indicate surprise, Your Honor, that I saw on the record. I think it was more of an objection for the record rather than an objection out of... That it wasn't a serious objection. I didn't take it as a serious objection, Your Honor. I think he certainly did object to it, but, again, this is the kind of testimony, as Judge Schroeder ruled, that is commonplace in these kinds of cases. It's commonplace that the government gives the proper notice, if it has an expert, and it gives the proper report, if it's going to propose an expert. That's the commonplace, is to adhere to the rules, particularly when you're the government. I mean, you've got all the cards here. Judge Gregory said, you know, all the weight's on your side of the table anyway. What you've got to do is be procedurally sound and come up here with a lot of baggage in your case, Well, and certainly, Your Honor, we wish we'd filed it on the 13th and not on the 16th. You should have filed it a month earlier. That's what I'm telling you. You should have filed it way earlier, and you should have told him, we're going to call this fella as an expert and do whatever you think you need to do to protect your client. Yes, Your Honor. That's their obligation. I mean, they're court-appointed lawyers. And I would agree, Your Honor, we should have done this earlier, but the fact is that Judge Schroeder, in his discretion, found that no one was... Judge Schroeder did. He ruled in your favor, and we viewed that for abuse of discretion. We all understand that. He ruled in your favor, and he said, but he also said, this is the way they normally do it, which sounds to me like that it may be an epidemic of doing it wrong. That's what worries me. Well, I can guarantee you... Maybe it needs to be fixed. I can guarantee you, Your Honor, it will be done. Maybe you need to be doing it right. We will do it a month ahead of time from this point on, Your Honor. Yeah, because that's what concerns me, too, because when you said, I err on the side of caution, erring on the side of caution is not, I'm going to have my cake and eat it, too. Erring on the side of caution is, I'm late, and therefore, he is restricted to only being a fact witness. That's erring on the side of caution. It's not, I'm going to have my cake and eat it, too. I got it this way, put an expert in it, too,  you use him as an expert. That's a serious matter, I think. We appreciate your efforts. Thank you, Your Honor. Thank you for your help. And the defense lawyers have reserved some time, one minute apiece. We might be strict on it this time. Actually, I'm prepared to wait my rebuttal time unless the panel has any questions. Thank you very much. Certainly. Thank you for your time. If Your Honor's please, going to the issue that just finished talking about the expert, it is noticeable within the record and reading the discourse that went on between the attorneys and the trial court and the circumstances how it was raised, this was a notable matter. This was not easily passed over by a defense counsel. I was not trial counsel at the time, but in reading the record, you can see a noticeable change in both the demeanor and the portions of the testimony that had to deal with the police officer who was being called. I'll only note one other thing that the court's probably aware of but I want to make sure of, that in Mr. Jeffrey's, you might have heard on numerous occasions where Wall Street, W-A-U-G-H, was his locale and where he was found and where his house was. There was a lot of information that was gleaned that somehow or another he was involved in some other places and did a lot of work in other places. The main point that we made in terms of the quantity of drugs was that the Wall Street was his location and that's where primarily he was found. Even the testimony from the government agents was that Wall Street was where he was generally located. So that's one reason, again, we're raising the issue as to the amount of drugs that are attributable directly to Mr. Jacobs. Thank you, Your Honor. Thank you, Mr. McFarland. Mr. Fisher. And, Your Honor, just briefly to follow up on a point that I made earlier, I mentioned a couple of the government's witnesses in this case. I specifically mentioned Toshi Mumford stated that Robert Poole was not a Bundy boy. I would just like to call the Court's attention to another witness, Jacqueline Adams, I believe, who was Mr. Hayes' girlfriend, specifically stated that Poole, quote, just worked, he wasn't part of the group. And with that, Your Honor, we would absolutely agree with that government's witness. Thank you. Thank you. Mr. Johnson. Judge, I would briefly say that I don't try all the cases that appear in front of Judge Schroeder. I just try the case, and sometimes I plead some of my cases in front of Judge Schroeder and other judges. But every objection I make, I make with the purpose of objecting to the evidence that's being proposed or in danger of being admitted. I did not make any quasi-objections that I didn't have any faith or heart in as to the expert. Upon receiving the notice, I went, after talking with my client, back to my office and prepared my motion to eliminate whereupon I could argue it before the court, at the proper time, before they called Corporal Marsh. Upon making my argument, upon reading my brief, it's in the record, or my motion eliminated, the judge made a determination. I don't generally jump up and down when a judge tells me I'm overruled. I have to proceed with the trial. We contend that there should be a bright line drawn here to say that it was not an abuse of discretion, and vice, in cases where they make a determination three, four, five days into a three-week trial or a two-week trial or a month-long trial, that a witness that they generally do not call as an expert, or information that they do not characterize as expert, because there may be a lawyer who may object to it, that they're now going to characterize it as an expert and err on the side of caution by then giving you notice that he's now going to be called as an expert. We would contend it opens the door in these kind of cases, conspiracy cases. We would ask the court to draw the line here, that in this particular case, when it's been asked for a week before the trial starts in an open-file policy, three days into the trial, that you notice him, an expert, that that is wrong and the case should be reversed and into the trial. Thank you, Your Honor. Thank you, Mr. Johnson. Before we come down, I want to particularly thank the defense attorneys for their efforts here. I know each of you is court-appointed and it's a tough case, and we appreciate your efforts. We couldn't operate without you. We're going to come down and meet counsel and go to the next case.
judges: Robert B. King, Roger L. Gregory, Stephanie D. Thacker